IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

NICOLE M. HUDSPETH,

    Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

    Defendant.

No. C15-2068

RULING ON JUDICIAL REVIEW

---

## TABLE OF CONTENTS

**I.**    **INTRODUCTION** ........................................ 2

**II.**    **PRINCIPLES OF REVIEW** ................................ 2

**III.**    **FACTS** ................................................ 3
    **A.**    *Hudspeth's Education and Employment Background* ........... 3
    **B.**    *Vocational Expert's Testimony from Administrative*
        *Hearing Held on September 4, 2013* ...................... 4
    **C.**    *Hudspeth's Medical History* ............................ 4

**IV.**    **CONCLUSIONS OF LAW** ................................. 9
    **A.**    *ALJ's Disability Determination* ........................ 9
    **B.**    *Objections Raised By Claimant* ........................ 12
        **1.**    *Substance Abuse* ............................... 12
        **2.**    *Listing § 12.04* ............................... 16
        **3.**    *Dr. Rahim's Opinions* .......................... 19
    **C.**    *Reversal or Remand* .................................. 23

**V.**    **CONCLUSION** ........................................ 24

**VI.**    **ORDER** ............................................. 24

# I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Nicole M. Hudspeth on August 4, 2015, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits.[1] Hudspeth asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Hudspeth requests the Court to remand this matter for further proceedings.

# II. PRINCIPLES OF REVIEW

The Commissioner's final determination not to award disability insurance benefits following an administrative hearing is subject to judicial review. 42 U.S.C. § 405(g). The Court has the authority to "enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." *Id.* The Commissioner's final determination not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3).

The Court "'must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.'" *Bernard v. Colvin*, 774 F.3d 482, 486 (8th Cir. 2014). Substantial evidence is defined as less than a preponderance of the evidence, but is relevant evidence a "'reasonable mind would find adequate to support the commissioner's conclusion.'" *Grable v. Colvin*, 770 F.3d 1196, 1201 (8th Cir. 2014). In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive

---

[1] On September 30, 2015, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

. . ." 42 U.S.C. § 405(g). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012)

In *Culbertson v. Shalala*, the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

30 F.3d 934, 939 (8th Cir. 1994). In *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). *See also Cline v. Colvin*, 771 F.3d 1098, 1102 (8th Cir. 2014) ("'As long as substantial evidence in the record supports the Commissioner's decision, [the court] may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently.' *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).").

### III. FACTS

#### A. Hudspeth's Education and Employment Background

Hudspeth was born in 1989. She is a high school graduate. She has no additional school or training after high school. In the past she worked as a sales attendant, dietary aide, fast food worker, and cashier.

## B. Vocational Expert's Testimony from Administrative Hearing Held on September 4, 2013

At the administrative hearing, the ALJ provided vocational expert Vanessa May with a hypothetical for an individual who is able to perform:

> medium work, simple routine tasks, environments for simple decisions like an assembly line or something like that, and occasional interaction with public, coworkers and supervisors, and by occasional . . . I'm . . . talking about working around other people, they could be around occasionally, but no need for direct interaction to work with them, for example, on a task or a goal.

(Administrative Record at 58.) The vocational expert testified that under such limitations, Hudspeth would be unable to perform any past work, but could perform the following jobs: (1) kitchen helper, (2) janitor, and (3) landscape laborer. The ALJ asked a second hypothetical which was identical to the first hypothetical except the individual "would be off-task several times a week for an hour or so at a time at unscheduled times usually due to some kind of emotional conflict with the coworker."[2] The vocational expert testified that under such limitations, Hudspeth would be precluded from competitive employment.

## C. Hudspeth's Medical History

On February 15, 2010, Hudspeth was admitted to the Covenant Medical Center's mental health unit, in Waterloo, Iowa, on a 48-hour emergency hospitalization order. Prior to her hospitalization, Hudspeth was in a dispute with her mother. The police were called, and Hudspeth was fearful she would be sent to jail. However, "she did not get any charges for anything and decided to take an overdose of her lithium and Risperdal so she would be brought to the hospital instead."[3] Hudspeth was diagnosed with bipolar affective

---

[2] Administrative Record at 60.

[3] *Id.* at 306.

4

disorder and alcohol abuse/dependence. During her hospital stay, doctors treated her with medication. She was prescribed new medication, and discharged on February 17.

On August 6, 2010, Hudspeth voluntarily entered the Horizons Family Centered Recovery Program in Waterloo, for treatment of chemical dependency, specific to alcohol, cocaine, and methamphetamine. The admission paperwork notes:

> [Hudspeth] was recently released from a 30-day stay in jail for probation violation. . . . This patient has had a recent suicide attempt while drunk and got into a physical altercation with her father. This is how she violated her probation for being drunk. The patient has had previous chemical dependency treatment here at Horizons as well as Pathways and also Allen Hospital as an adolescent. She was recently discharged for noncompliance at Pathways. This patient began her alcohol use at the age of 14. Her last drink was on July 8, 2010. The patient reports drinking several times a week until she blacks out. The patient's first use of cocaine was the age of 20. Her last use was June of 2010. She also reports to trying methamphetamine. She denied the use of any other chemicals.

(Administrative Record at 319.) The admission report also notes that Hudspeth had been treated for depression in the past. In July 2010, she attempted suicide by hanging herself. She was drunk at the time of the suicide attempt. Hudspeth was diagnosed with depression and bipolar disorder. At the time, her mental health difficulties were being treated with medication. On September 3, 2010, Hudspeth was discharged from the treatment center for noncompliance. Specifically, her discharge report states:

> Throughout her treatment in the dual diagnosis group, she was rather quiet but compliant. The patient then relapsed and was also having mental health issues and was admitted into the Allen Psychiatric Unit. Upon discharge, she did come into our inpatient program, was discharged and due to come back to the dual diagnosis program, however, did not show up and therefore is being discharged for noncompliance.

(Administrative Record at 323.)

5

The next day, on September 4, 2010, Hudspeth was re-admitted into Allen Memorial Hospital in Waterloo, on emergency detention. Following her discharge on September 3 from the Horizons program, Hudspeth became intoxicated and suicidal. Hudspeth's family called the police and she was ordered to Allen Memorial Hospital for treatment. Hudspeth was diagnosed with mood disorder and alcohol and marijuana abuse. She was prescribed medication as treatment, and discharged to jail on September 8. Doctors recommended Hudspeth go to MECCA, a substance abuse treatment center, in Des Moines for further treatment.

On January 24, 2011, Hudspeth voluntarily re-entered Horizons for alcohol abuse. The admission note provides Hudspeth:

> came to use [(*sic*)] from jail and if she does not complete treatment, she has 11 more days to serve. She has had previous treatments. She was with us at Horizons in the fall of 2010. She was also at Pathways and MECCA in October or November 2010. . . . Patient has a history of bipolar and often gets out-of-control having blackouts while drinking.

(Administrative Record at 340.) Hudspeth was diagnosed with bipolar disorder, anxiety, and depression. It was noted that she also struggles with anger and being quick to react negatively to situations. Hudspeth was discharged on January 31, 2011 to seek treatment at Pathways.

On July 25, 2011, Hudspeth was admitted to Allen Memorial Hospital for self-harm. Prior to going to the hospital, Hudspeth stated she became intoxicated and cut herself. Hudspeth described her symptoms as follows:

> She reports decreased energy levels. Reports of difficulty concentrating, reports of times in which she does not remember because of anger. She has also talked about suicidal thoughts, which are more problematic recently.

(Administrative Record at 469.) Hudspeth was diagnosed with mood disorder, alcohol abuse versus dependence, marijuana abuse, anxiety disorder, and features of PTSD with

substance-induced anxiety problems. On August 18, 2011, Hudspeth was discharged to Sheriff's custody to be taken to a Mitchell County care facility.[4] During the course of her hospitalization at Allen Memorial, Hudspeth was primarily treated with medications.

On July 26, 2011, while at Allen Memorial Hospital, Hudspeth was referred to Dr. Patrick W. O'Conner, Ph.D., for a psychological assessment. Dr. O'Conner administered the Millon Clinical Multiaxial Inventory III test to Hudspeth. The test revealed the following personality traits for Hudspeth:

> She is usually able to function on a satisfactory basis, she may experience periods of marked emotional, cognitive, or behavioral dysfunction. The profile of this sad woman advances the view that she is markedly dependent, docile, self-effacing, and ineffectual. . . . She may be unable to function autonomously and is especially vulnerable to separation anxieties and fears of desertion. . . . She may become apprehensive, withdraw from personal involvements, be overly self-critical, and punish herself. . . . This may result in deep feelings of loneliness and isolation and a disturbing mixture of anxiety, sadness, anger, and guilt.

(Administrative Record at 593-94.) Dr. O'Conner diagnosed Hudspeth with major depressive disorder, generalized anxiety disorder, periodic thoughts of suicide, dependent personality disorder with avoidant personality traits and negativistic personality traits. Dr. O'Conner recommended medication and therapy as treatment.

On November 9, 2011, Dr. A. Rahim, M.D., her treating doctor while she resided at the Mitchell County care facility, provided Disability Determination Services ("DDS") with a letter regarding Hudspeth's psychiatric health. Dr. Rahim noted Hudspeth "continues to reside at a care facility due to needing more stabilization before she can be

---

[4] According to the record, Hudspeth was discharged from the Mitchell County care facility on February 1, 2012. She was referred to Cedar Valley Community Living Support Services for follow-up care.

considered to be placed in less constructive setting semi independent living."[5]  Dr. Rahim listed multiple medications Hudspeth takes daily to treat her symptoms, including Wellbutrin, clonazepam, Haldol, lithium carbonate, and trazodone.  Dr. Rahim opined:

> as for her ability to remember and understand instructions, procedures and locations I believe she is competent to do so as long as they are simple but I do not believe that she can carry out instructions, maintain attention, concentration, and pace or interact appropriately with supervisors, co-workers, and the public and use good judgment and respond appropriately to changes in the work place.

(Administrative Record at 518.)

On December 16, 2011, Dr. David A. Christiansen, Ph.D., reviewed Hudspeth's medical records and provided DDS with a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment for Hudspeth.  On the Psychiatric Review Technique assessment, Dr. Christiansen diagnosed Hudspeth with depression and alcohol and drug addictions.  Dr. Christiansen determined Hudspeth had the following limitations: marked restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Christiansen determined Hudspeth was moderately limited in her ability to:  understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, maintain socially appropriate behavior and adhere to basic standards of neatness

---

[5] Administrative Record at 518.

and cleanliness, respond appropriately to changes in the work setting, and be aware of normal hazards and take appropriate precautions. Dr. Christiansen concluded:

> When using [substances], [Hudspeth] is not capable of understanding or carrying out instructions and procedures, maintaining daily living, or relating appropriately to others. When sober, according to her work record and her [activities of daily living] while in the care facility, she is capable of understanding and carrying [out] at least simple instructions and procedures, relating to others appropriately, and maintaining basic social skills.

(Administrative Record at 76.)

Following her discharge from the Mitchell County care facility on February 1, 2012, Hudspeth was taken to Covenant Medical Center on February 10 for acting out due to combining her medication with alcohol. Later between February 10 and March 26, 2012, Hudspeth was taken to Allen Memorial Hospital for worsening depression, anxiety, and suicidal ideation. On March 26, she was admitted to Prairie View residential facility. At the time of her administrative hearing, on September 4, 2013, Hudspeth continued to reside at Prairie View. She stated at the hearing that she was scheduled to be discharged in mid-September.

## IV. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Hudspeth is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Moore v. Colvin*, 769 F.3d 987, 988 (8th Cir. 2014). The five steps an ALJ must consider are:

> (1) whether the claimant is currently employed; (2) whether the claimant is severely impaired; (3) whether the impairment is or approximates an impairment listed in Appendix 1; (4) whether the claimant can perform past relevant work; and,

9

if not, (5) whether the claimant can perform any other kind of work.

*Hill v. Colvin*, 753 F.3d 798, 800 (8th Cir. 2014); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "'bears the burden of demonstrating an inability to return to [his] or her past relevant work.'" *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "'the claimant has the physical residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with [his or] her impairments and vocational factors such as age, education, and work experience.'" *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a)(1); *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014). The ALJ bears the

responsibility for determining "'a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or] her limitations.'" *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined Hudspeth had not engaged in substantial gainful activity since July 1, 2010. At the second step, the ALJ concluded from the medical evidence Hudspeth had the following severe impairments: degenerative disc disease, major depressive disorder, generalized anxiety disorder, personality disorder, and alcohol and drug abuse. At the third step, the ALJ found Hudspeth's impairments, including her substance use disorder, meet sections 12.04, 12.06, 12.08, and 12.09 of 20 C.F.R. Pt. 404, Subpt. P, App. 1. However, also at step three, the ALJ determined if Hudspeth stopped her substance use, she would not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined if Hudspeth stopped her substance use, her RFC would be as follows:

> [Hudspeth] would have the Residual Functional Capacity to perform a range of medium work[.] . . . She is limited to simple, routine tasks; can work in an environment requiring only simple decisions and few work place changes; cannot work at a production rate place [(*sic*)]; and can tolerate occasional interaction with co-workers, supervisors, and the public without a need for direct interaction with them on any task or goal.

(Administrative Record at 19.) Also at the fourth step, the ALJ determined Hudspeth has no past relevant work. At the fifth step, the ALJ determined if she abstained from substance use, then based on her age, education, previous work experience, and RFC, Hudspeth could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded Hudspeth was not disabled.

## B.  Objections Raised By Claimant

Hudspeth argues the ALJ erred in three respects.  First, Hudspeth argues the ALJ erred in finding substance abuse was a contributing factor material to an otherwise favorable disability determination.  Second, Hudspeth argues the ALJ failed to properly consider whether she met or equaled Listing § 12.04C(3) and was disabled regardless of her substance abuse.  Lastly, Hudspeth argues the ALJ failed to properly evaluate the opinions of Dr. Rahim, a treating source.

### 1.  Substance Abuse

Hudspeth apparently concedes the ALJ properly followed the methodology for determining whether substance use is a contributing factor material to the determination of disability.  Hudspeth takes issue with the ALJ's conclusion that if she stopped her substance use, she would not be disabled and have the functional capacity to perform work that exists in significant numbers in the national economy.  Hudspeth maintains that even if substance use is removed as a factor in determining disability, she has non-substance abuse impairments which support a finding of disability.  Specifically, Hudspeth maintains even if she stopped her substance abuse, she would continue to have marked limitations in the areas of activities of daily living, social functioning, and concentration, persistence, or pace; thereby, supporting a finding of disability.  Hudspeth concludes the ALJ's decision on the issue of substance abuse is not supported by substantial evidence on the record as a whole.

In 1996, Congress amended the Social Security Act to eliminate benefits for disabilities arising from addiction to alcohol or other drugs.  *See* Pub. L. No. 104-121, 110 Stat. 847; *see also Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th Cir. 2003) (discussing the 1996 Congressional amendment); *Jackson v. Apfel*, 162 F.3d 533, 537 (8th Cir. 1998) (same).  The regulations implemented this law at 20 C.F.R. § 404.1535 (relating to applications for disability insurance benefits) and 20 C.F.R. § 416.935

(relating to applications for SSI benefits). The two sections are identical and provide as follows:

> How we will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>
> (a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>
> (b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.
>
>> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
>>
>> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
>>
>> (I) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>>
>> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. §§ 404.1535, 416.935.

According to the regulations, the ALJ must first determine whether the claimant is disabled. *See* 20 C.F.R. § 416.935 (*"If we find that you are disabled* and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." (emphasis added)). "The ALJ must reach this determination initially . . . using the five-step approach described in 20 C.F.R. § 404.1520 without segregating out any effects that might be due to substance use disorders." *Brueggemann*, 348 F.3d at 694 (citation omitted).

If the ALJ determines that all of a claimant's limitations, including the effects of substance use disorders, show that the claimant is disabled, then the ALJ "must next consider which limitations would remain when the effects of the substance use disorders are absent." *Id.* at 694-95 (citing *Pettit v. Apfel*, 218 F.3d 901, 903 (8th Cir. 2000); 20 C.F.R. § 404.1535(b)(2)). "The focus of the inquiry is on the impairments remaining if the substance abuse ceased, and whether those impairments are disabling, regardless of their cause." *Pettit*, 218 F.3d at 903 (citations omitted). The claimant carries the burden of proving that alcoholism or drug addiction is not a material factor to the finding of disability. *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (citing *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000)). "If the ALJ is unable to determine whether substance abuse disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow. . . . In colloquial terms, on the issue of materiality of alcoholism, a tie goes to [the claimant]." *Brueggemann*, 348 F.3d at 693 (citation omitted). Accordingly, the ALJ is required to develop a full and fair record and support his or her conclusions with substantial evidence. *Id.* at 695. In summary, "[o]nly after the ALJ has made an initial determination 1) that [the claimant] is disabled, 2) that drug or alcohol use is a concern, and 3) that substantial evidence on the record shows what limitations would remain in the

14

absence of alcoholism or drug addiction, may [the ALJ] then reach a conclusion on whether [the claimant's] substance use disorders are a contributing factor material to the determination of disability." *Id.*

Here, the ALJ followed the analytical framework set forth in the regulations. The ALJ first applied the five-step sequential evaluation process for determining whether an individual is disabled, and determined Hudspeth was disabled because she satisfied the "paragraph A" and "paragraph B" criterion of Listing §§ 12.04, 12.06, 12.08, and 12.09. That is, when engaged in substance use and/or abuse, Hudspeth had a "persistence of depressive and anxiety disorders accompanied by persistent disturbances of mood and affect, sleep disturbances, psycho motor disturbances, decreased energy, thoughts of suicide, and recurrent panic attacks," and had marked limitations in the areas of activities of daily living, social functioning, and concentration, persistence, or pace.[6] Next, the ALJ determined that if Hudspeth stopped the substance use, she would continue to have a severe impairment or combination of impairments. The ALJ concluded, however, that absent the substance use, her remaining limitations were not disabling because she would have only moderate limitations in the areas of social functioning and concentration, persistence, or pace, and no limitations in the area of activities of daily living.[7] Therefore, having reviewed the entire record, the Court finds that the ALJ properly analyzed the issue of Hudspeth's substance abuse in accordance with both the law and Social Security Regulations. At this point, the Court makes no determination on the ALJ's conclusion that absent the substance use, Hudspeth is not disabled. Instead, the Court will address the remaining issues raised by Hudspeth on appeal, and determine whether absent substance

_____

[6] *See* Administrative Record at 16.

[7] *Id.* at 17-18 (providing a thorough discussion of the reasons for finding only moderate limitations if Hudspeth stopped her substance use).

use there is substantial evidence on the record as a whole to support the ALJ's disability determination.

### 2. *Listing § 12.04*

At step three of the five-step sequential analysis, an ALJ is required to determine whether a claimant's alleged impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. If a claimant's impairment, in fact, meets one of the impairments in the "Listings," then the ALJ must find that he or she is disabled. Hudspeth argues she is presumptively disabled because she meets or equals Listing § 12.04(C) for depressive disorder. Hudspeth maintains the ALJ's failure to find her disabled based on Listing § 12.04(C) requires remand for further consideration by the ALJ.

Listing § 12.04 provides in pertinent part:

> 12.04 *Affective Disorders*: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements of C are satisfied. . . .
>
> C.   Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support and one of the following:. . . .
>     3.   Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C)(3). The burden is on the claimant to show that his or her impairment meets or equals a listing. *Carlson v. Asture*, 604 F.3d 589, 593 (8th Cir. 2010) (citing *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir.

2004)). Furthermore, in order to meet a listing, "'an impairment must meet all of the listing's specified criteria.'" *Id.*; *see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his [or her] impairment matches a listing, it must meet *all* of the specified medical criteria.").

In considering the "paragraph C" criteria for Listing § 12.04, the ALJ determined:

> In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The record does not demonstrate that [Hudspeth], despite symptoms or signs currently attenuated by medication or psychosocial support, has an inability to function outside a highly supportive living arrangement, has a residual disease process that would result in decompensation due to even a slight increase in mental demands or change in environment, has a history of at least one year's inability to function outside a highly supportive environment, or has a complete inability to function independently outside her home. Nor does the record demonstrate that [Hudspeth] has experienced repeated episodes of decompensation. Based upon the foregoing, the undersigned finds that the "paragraph C" criteria are not met.

(Administrative Record at 18.)

Contrary to the ALJ's conclusory determination, evidence in the record does demonstrate that Hudspeth (1) has a medically documented history of a chronic affective disorder (major depressive disorder) of at least two years' duration which has caused more than a minimal limitation in her ability to perform basic work activities; and (2) at the time of the administrative hearing, she had a history of over 1 years' inability to function outside a highly supportive living arrangement. In her brief, Hudspeth supports her contention that she meets Listing § 12.04(C)(3) as follows:

> [Hudspeth's] symptoms or signs were attenuated by medication or psychosocial support. The evidence on this point is clear. Before entering the Mitchell County care facility and, later, the Prairie View residential facility, [she] was frequently hospitalized, including August 25-26, September 4-8, and

> November 18-25, 2010 and July 25 to August 18, 2011. (*See*
> [administrative record at] 486, 495, 522, 526).

Hudspeth's Brief (docket number 13) at 17. Furthermore, Hudspeth asserts she:

> resided for almost two full years in facilities. In August 2011,
> [she] was discharged from the hospital into the Sheriff's
> custody to be transferred to the Mitchell County care facility
> under the care of Dr. A. Rahim. (A.R. 524). . . . After
> discharge [from the Mitchell County facility on February 1,
> 2012], [she] briefly was living on her own, but returned to
> drinking. (A.R. 624). On February 10, 2012, [she] was taken
> by ambulance to Covenant Medical Center (A.R. 625). . . .
> At the administrative hearing [in September 2013], [she] was
> still at Prairie View[, where she was admitted in March 2012,]
> and expected to leave there within a week after the hearing.
> (A.R. 37).

*Id.* at 17-18. Additionally, in her brief, Hudspeth explains that during her time at Prairie

View:

> while institutionalized and largely sober (except for two
> incidents), [she] continued to experience issues related to her
> depression, anxiety, and/or personality disorder. These
> incidents represent behavior that would not be acceptable in an
> employment setting, including insubordination, disruptive
> behavior, and even physical assault. The record reflects some
> 84 incidents over about 17 months, an average of about five
> incidents a month or more than once a week.

*Id.* at 18.[8] Hudspeth concludes this matter should be remanded because:

> The ALJ's conclusory finding that [she] did not meet the
> Paragraph C criteria of the Listing is contrary to the substantial
> evidence in the record and is not supported by substantial
> evidence in the record as a whole. While the ALJ asked [her]
> about some of these incidents at the hearing, the ALJ's written
> decision does not address [her] time at the Mitchell County

---

[8] *See also id.* at 18-23 (documentation in Hudspeth's brief, with reference to the
record, of all of her incidents at Prairie View from May 2012 - August 2013).

care facility at all and barely mentions [her] 17 months at
Prairie View. Moreover, the ALJ's only reference to Prairie
View is in the context of [her] pending discharge. In short,
the ALJ essentially ignored [her] need for an institutional level
of care at the Mitchell County care facility and Prairie View
residential care facility for two years. The ALJ failed to
explain why [she] did not meet the requirements of the
Paragraph C criteria of the Listings.

*Id.* at 23.

In reviewing the ALJ's decision, the Court bears in mind that an ALJ has a duty to
develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007).
Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop
the record fully and fairly in order that "'deserving claimants who apply for benefits
receive justice.'" *Wilcutts v. Apfel*, 143 F.3d at 1134, 1138 (8th Cir. 1998) (quotation
omitted). Having reviewed the entire record, the Court agrees with Hudspeth and finds
the ALJ has not fully met his duty to fully and fairly develop the record. Here, the ALJ
failed to fully evaluate and consider whether Hudspeth meets the criteria of Listing
§ 12.04(C)(3). The ALJ failed to address Hudspeth's nearly 2 years of institutionalized
living and need of a highly supportive living arrangement. Moreover, the ALJ's
discussion of the "paragraph C" criteria is merely conclusory and fails to address whether
Hudspeth's living arrangments at both the Mitchell County care facility and Prairie View
residential facility meet Listing § 12.04(C)(3). Accordingly, the Court determines that this
matter should be remanded for further consideration of whether if Hudspeth stopped her
substance use, she would meet Listing § 12.04(C)(3).

### 3. *Dr. Rahim's Opinions*

Hudspeth argues the ALJ failed to properly evaluate the opinions of her treating
physician, Dr. Rahim. Specifically, Hudspeth argues the ALJ failed to properly weigh
Dr. Rahim's opinions. Hudspeth also argues the ALJ failed to give "good" reasons for

discounting Dr. Rahim's opinions. Hudspeth concludes this matter should be remanded for further consideration of Dr. Rahim's opinions.

The ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence of the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"). The ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hamilton v. Astrue*, 518 F.3d 607, 609 (8th Cir. 2008).

Also, the regulations require an ALJ to give "good reasons" for assigning weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(c)(2). An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion from a treating source is not given controlling weight, then the ALJ considers the following factors for determining the weight to be given to all medical opinions: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(c)). "'It is the ALJ's function to resolve

conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). The decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. SSR *96-2P*, 1996 WL 374188 (1996).

In his decision, the ALJ addresses Dr. Rahim's opinions as follows:

> The undersigned gives only partial weight to the opinion of treating source A. Rahm [(sic)], M.D. Dr. Rahm's [(sic)] opinion that [Hudspeth] is capable of understanding and remembering simple instructions, procedures, and locations is well supported by his treatment notes, his conclusions are otherwise belied by other evidence of record. For example, Dr. Rahm's [(sic)] statement that [Hudspeth] is unable to maintain attention, concentration, or pace is inconsistent with [her] own admission that she can pay attention "for a long time, an hour or more." Similarly, although the cumulative evidence supports a conclusion [Hudspeth] had moderate limitations in social functioning, Dr. Rahm's [(sic)] assessment that [she] is totally unable to interact appropriately with supervisors, co-workers, and supervisors is inconsistent with her testimony and the evidence of her abilities to reside with others, engage in romantic relationship, function in public settings, and perform a job that involves public interaction. Accordingly, the undersigned gives only partial weight to Dr. Rahm's [(sic)] opinion.

(Administrative Record at 22.)

In reviewing the ALJ's decision, the Court, again, bears in mind that an ALJ has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618. Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record

fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quotation omitted). The Court finds that the ALJ has not fully met these requirements.

Here, Dr. Rahim opined Hudspeth "continues to reside at a care facility due to needing more stabilization before she can be considered to be placed in less constructive setting semi independent living."[9] After making this statement in November 2011, Hudspeth was institutionalized at the Mitchell County care facility and Prairie View facility for a combined 22 months. Furthermore, based on his treatment of Hudspeth while in residential care facilities, Dr. Rahim concluded it would be difficult for her to "carry out instructions, maintain attention, concentration, and pace or interact appropriately with supervisors, co-workers, and the public and use good judgment and respond appropriately to changes in the work place."[10] The Court is unconvinced that Hudspeth's statement in a functional ability work sheet that she is capable of concentrating for *one-hour* is a sufficient reason to discount her treating physician's opinion that she would have difficulty with maintaining attention, concentration, and pace, during a typical *eight-hour* workday. Moreover, because the ALJ failed to address Hudspeth's history of extended living in residential care facilities and difficulty getting along with staff and other patients at the facilities, the Court is unconvinced by the ALJ's reasons for discounting Dr. Rahim's opinions with regard to her ability to interact appropriately with supervisors, co-workers, and the public.

Therefore, under such circumstances, and having reviewed the entire record, the Court concludes the ALJ has failed to give "good reasons" for rejecting the opinions of Dr. Rahim. *See Tilley*, 580 F.3d at 680 ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion."). The Court

_____

[9] Administrative Record at 518.

[10] *Id.*

further finds that the ALJ failed in his duty to fully and fairly develop the record with regard to Dr. Rahim's opinions. Accordingly, the Court determines that this matter should be remanded for further consideration of Dr. Rahim's opinions. On remand, the ALJ shall provide clear reasons for accepting or rejecting Dr. Rahim's opinions and support his reasons with evidence from the full record, including consideration of Hudspeth's time residing in the Mitchell County care facility and Prairie View residential care facility.

## C.  Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ simply failed to: (1) properly consider and address whether absent substance use Hudspeth meets Listing § 12.04(C)(3); and (2) properly evaluate the opinions of Dr. Rahim.

23

## V. CONCLUSION

The Court concludes this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ must fully address whether if Hudspeth stopped her substance use, she would meet Listing § 12.04(C)(3). The ALJ must also provide clear reasons for accepting or rejecting Dr. Rahim's opinions and support his reasons with evidence from the full record, including Hudspeth's time residing in the Mitchell County care facility and Prairie View residential care facility.

## VI. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this 22nd day of April, 2016.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA